UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**CENTRAL DIVISION AT LEXINGTON**

| | |
|---|---|
| BARBARA OLINGER, as Mother and Next Friend of "A", a Minor Child Under the Age of 18 Years, | ) ) ) ) |
| Plaintiffs, | ) ) ) |
| V. | ) ) |
| THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS and JASON STARKS, | ) ) ) ) |
| Defendants. | ) |

Civil Action No. 5:07-29-JMH

DEFENDANT CORPORATION OF THE PRESIDENT OF
THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS'
<u>MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>

Defendant Corporation of the President of The Church of Jesus Christ of Latter-day Saints ("COP"), incorrectly sued herein as The Church of Jesus Christ of Latter-day Saints ("the Church")[1], by counsel, hereby submits the following memorandum in support of its motion for summary judgment.

**<u>INTRODUCTION</u>**

Plaintiff Barbara Olinger, as mother and next friend of her son "A", filed this action against The Church of Jesus Christ of Latter-day Saints ("the LDS Church" or "the Church") and Jason Stark (incorrectly named as "Jason Starks") alleging that "A" was abused by Stark while Stark was serving as a missionary for the Church. In her complaint, Olinger admits that Stark's abuse of "A" was "against the morals of the very church which he was representing."

---

[1] In pleadings filed with the Court, it has been made clear that the Church does not exist as a legal, corporate entity and does not hold assets. COP finances the operation of the Church and as such is the proper defendant. COP and the Church will be collectively referred to as "Church Defendants."

(Complaint at ¶ 4).  The complaint does not list specific causes of action, but seeks to hold the Church vicariously liable for Stark's alleged abuse of "A."  Kentucky law, however, holds that sexual misconduct by clergy is outside the course and scope of employment as a matter of law, and that an employing denomination cannot be held liable for such conduct.  "To accept such a theory would in effect require [a church] to become an absolute insurer for the behavior of anyone who was in the priesthood and would result in strict liability on the part of the [church] for any actionable wrong involving a parishioner.  We must conclude that such an argument is absurd."  *Osborne v. Payne*, 31 S.W.3d 911, 915 (Ky. 2000).  This is especially true where, as here, the responsible denomination has no prior notice that the alleged abuser would pose a danger to the victim, and there is no evidence which supports a claim for independent negligence.  *Id*.  Because Kentucky law makes clear that Church defendants are not vicariously liable, summary judgment should be granted in the Church Defendants' favor.

## STATEMENT OF FACTS[2]

**I.   THE CHURCH'S MISSIONARY PROGRAM AND MISSIONARY APPLICATION PROCESS.**

Missionary work is extremely important to the Church.  The Church takes seriously Christ's commandment near the end of his earthly ministry to go "into all the world, and preach the Gospel to every creature".  Affidavit of Dennis C. Brimhall ("Brimhall Affidavit") at ¶6[3].  Currently, the Church has approximately 53,000 missionaries in 176 countries.  *Id*. at ¶ 7.

To serve a mission is a privilege for members of the Church.  Single men between the ages of 19 and 25, single women over age 21, and retired married couples who meet the Church's standards of worthiness, may be selected as full-time missionaries.  *Id*. at ¶ 8.

---

[2] Although this lawsuit was filed on December 18, 2006, as of the date of this memorandum, no depositions have been taken and no written discovery has been taken by the Plaintiff.
[3] A copy of the Brimhall Affidavit is attached hereto as Exhibit 1.

Young people prepare at an early age to serve missions. Preparation may include saving money, as it is the responsibility of the missionary and his or her parents to pay all living expenses during the time of the mission. Early preparation may also include studying the gospel and gaining experiences in spiritual matters so that they will be able to explain their faith to others. Missionaries study all of the Church's scriptures, but especially the Book of Mormon, to learn the doctrines of the LDS Church. Young people usually attend voluntary religion classes during their high school years, to help them better understand and live the doctrines of the Church. *Id*. at ¶ 9.

When a young person reaches missionary age, he or she applies to go on a mission. The prospective missionary speaks with his or her local clergyman, called a bishop, who conducts a searching interview with the candidate to determine worthiness to serve, qualifications, and the individual's physical and emotional capability to serve. If the candidate seems worthy, the bishop gives the candidate a missionary recommendation packet. The packet includes forms to be completed by the missionary and Church officer and by medical professionals. Because the clergyman and the prospective missionary live in the same area, the bishop often knows the prospective missionary well. In many cases the missionary has lived in the same geographic area as the bishop for many years, often for his whole life. *Id*. at ¶ 10.

The missionary then fills out the recommendation packet, which contains questions on health, family background, educational and work experience, and similar subjects. The packet asks for information about any criminal history. The bishop then conducts a second interview with the candidate, interviewing him or her in even greater detail. In both interviews specific questions about the candidate's sexual history are asked. Anyone who indicates any problems

with the law of chastity, including any attraction to or improper conduct with young children, is not allowed to complete the application process. *Id*. at ¶ 11.

After the bishop is satisfied of the candidate's worthiness, he forwards the candidate's application packet to his ecclesiastical superior, the stake president. The stake president interviews the candidate and again asks probing questions about his or her worthiness to serve a mission, including questions about sexual history and activities. Again, anyone who indicates any problems with the law of chastity, including improper attraction to or actions with children, is not allowed to serve. If the candidate is worthy, the stake president submits the forms to the Church's Missionary Department. *Id*. at ¶ 12.

The Missionary Department screens the applications. If the candidate seems worthy and prepared to serve, the candidate's application is passed on to senior ecclesiastical officers, who decide where each candidate should serve. *Id*. at ¶ 13. A letter is then sent to each missionary informing him or her of their place of missionary service. *Id*. at ¶ 14

## II. TRAINING AND BEHAVIOR EXPECTED OF MISSIONARIES. SUPERVISION OF MISSIONARIES DURING MISSIONARY SERVICE.

Within approximately a month of receiving the letter indicating his or her application has been accepted, the candidate reports to the Missionary Training Center. If the missionary will not be learning a second language, the candidate stays at the Missionary Training Center for three weeks, receiving instruction in rules for missionaries, proper conduct, and how to teach the gospel. If the missionary is learning a second language, the period of instruction at the Missionary Training Center is two months or more. *Id*. at ¶ 14.

While at the Missionary Training Center, missionaries are given a copy of the Missionary Handbook, which is a small white booklet which they are instructed always to keep with them.

4

Copies of pertinent sections of the Missionary Handbook are attached to the Brimhall Affidavit as Exhibit "A." The Handbook instructs that

> As missionaries, you are expected to maintain the highest standards of conduct, including strict observance of the law of chastity, which forbids any sexual conduct of any kind whatsoever. In addition, you need to be aware that any touching of the private parts of another person, whether under or over clothing, can also constitute criminal conduct. If the victim is a child or youth, the penalties are especially severe, including imprisonment.
>
> To assist you to obey the law of chastity and to avoid criminal charges, you should always remain with your companion. You should never be alone with anyone else, male or female, adult or child.
>
> Even false accusations against an innocent missionary can take many months to investigate and may result in disruption or termination of missionary service. Protect yourselves from such accusations by never being separated from your companion, even in the homes you visit, and by avoiding any touching that could possibly lead to accusations, such as holding a child on your lap, hugging, tickling, or being too familiar with a child or adolescent.

*Id*. at ¶ 15. (Handbook pages 13-14).

After completion of the Missionary Training Center courses, the missionaries are sent to their missions, where they are met by their Mission Presidents. The Mission Presidents, as well as assistants working for the Mission Presidents, stress the importance of abiding by all of the mission rules, including staying with companions and never acting inappropriately with children. *Id*. at ¶ 16.

While performing missionary service, missionaries are interviewed every six weeks by their mission presidents. During these interviews, they are asked questions about whether they continue to be worthy to serve missions, including questions about whether they are observing the law of chastity. *Id*. at ¶ 17.

Thus, Stark was thoroughly trained as a missionary to avoid being alone with children, and certainly to avoid abusing them. As a missionary at the Missionary Training Center, Stark was instructed to obey the law of chastity, to avoid sexual conduct of any kind outside of marriage, to always stay in sight of his missionary companion, and even to avoid any behavior which could be misunderstood or appear inappropriate. *See* Brimhall Affidavit at ¶ 15.

**III. THE CHURCH'S DOCTRINE ON CHILD ABUSE.**

Abuse of any child by any member of the Church is strictly against the doctrine of the LDS Church. *Id.* at ¶ 18. Gordon B. Hinckley, the Prophet and President of the Church summed up the Church's position on abuse in an April 2002 talk at the Church's semi-annual General Conference: He stated "'The Church's position is that abuse cannot be tolerated in any form. Those who abuse … are subject to Church discipline." *Id.* at ¶ 18. In the same talk, President Hinckley read from a 2002 warning of the First Presidency and the Quorum of the Twelve Apostles addressed to missionaries: "'As missionaries, you are expected to maintain the highest standards of conduct, including strict observance of the law of chastity…. You should never be alone with anyone else, male or female, adult or child [other than your assigned companion]. Even false accusations against an innocent missionary can take many months to investigate and may result in disruption or termination of missionary service. Protect yourselves from such accusations by never being separated from your companion, even in the homes you visit.'" "Personal Worthiness to Exercise the Priesthood", *The Ensign,* May 2002, attached as Exhibit "B" to the Brimhall Affidavit. *Id.* at ¶ 18.

In an earlier talk in General Conference, President Hinckley said "And then there is the terrible, vicious practice of sexual abuse. It is beyond understanding. It is an affront to the decency that ought to exist in every man and woman. It is a violation of that which is sacred and

6

divine. It is destructive in the lives of children. It is reprehensible, and worthy of the most severe condemnation. Shame on any man or woman who would sexually abuse a child. In doing so, the abuser not only does the most serious kind of injury. He or she also stands condemned before the Lord." *The Ensign*, October 1994, p. 34, attached as Exhibit "C" to the Brimhall Affidavit. *Id*. at ¶ 19.

## IV. STARK'S SELECTION AS A MISSIONARY.

In March of 2004 Jason Stark was a member of the Hibbard 1st Ward of The Church of Jesus Christ of Latter-day Saints. A ward is the local congregation of the Church. That ward is part of a grouping of thirteen wards, called a "stake", which is known as the Rexburg Idaho North Stake. Affidavit of Wes Donahoo ("Donahoo Affidavit") at ¶ 2[4]; Affidavit of Wylie Gene Powell ("Powell Affidavit") at ¶¶ 2, 3[5]. In early March of 2004 Stark approached the local clergyman of his ward, Bishop Wes Donahoo, saying he wished to apply to serve a mission. At the time of this application, Bishop Donahoo, who had known Stark for approximately 14 years, had heard nothing about him which led Donahoo to believe he would pose a danger to children. Further, Donahoo had observed nothing in Stark's manner or activities which led him to believe Stark would abuse or harm children. Donahoo interviewed Stark and asked him many questions about his worthiness to serve a mission, including specific questions about his sexual history. None of his answers indicated that Stark had any tendency to act inappropriately with children. Donahoo Affidavit at ¶ 4.

Stark was then interviewed by Wylie Gene Powell, President of the Rexburg Idaho North Stake. At the time of the interview President Powell had heard nothing about Stark which led him to believe that Stark would pose a danger to children, and had observed nothing in his

---

[4] A copy of the Affidavit of Wes Donahoo is attached hereto as <u>Exhibit 2</u>.
[5] A copy of the Affidavit of Wylie Gene Powell is attached hereto as <u>Exhibit 3</u>.

manner or activities which led him to believe Stark would abuse or harm children. Just as Bishop Donahoo had done, President Powell asked Stark many questions about his worthiness to serve a mission, including specific questions about his sexual history. Again, none of his answers indicated that Stark had any tendency to act inappropriately with children. Powell Affidavit at ¶¶ 2-4.

On March 28, 2004, Bishop Donahoo was replaced as Bishop of the Hibbard 1st Ward by Bishop Craig Porter. Donahoo Affidavit at ¶ 2, Affidavit of Craig Laurin Porter ("Porter Affidavit") at ¶ 2[6]. At the time Porter became Bishop, he had known Stark for approximately 14 years. Porter was Stark's local clergyman from March 28, 2004, until Stark left for the Church's Missionary Training Center on July 21, 2004. *Id*. at ¶ 3. When Porter became bishop he had no knowledge that would lead him to believe that Stark might be a danger to children. He talked with Stark on several occasions between March 28, 2004 and July 1, 2004, and in their conversations Stark said nothing to lead Porter to believe that Stark might later commit the crimes of which he has been accused. Likewise, during that time period no one in Bishop Porter's congregation or in the community came to Porter to tell him that they had any knowledge of suspicion that Stark might harm or abuse children. *Id.* at ¶ 4.

## V. STARK'S SERVICE IN KENTUCKY.

Stark arrived in the Kentucky Louisville Mission on August 10, 2004. He was met and interviewed by Dennis C. Brimhall, President of that Mission. Brimhall Affidavit at ¶ 3. At the time Stark arrived in the mission President Brimhall had heard nothing about Stark which led him to believe that Stark would pose a danger to children. Brimhall interviewed Stark several times from August 14, 2004 until the time the allegations were made against Stark in December 2005. Nothing Stark said gave Brimhall reason to believe that Stark had any tendency to act

---

[6] A copy of the Affidavit of Craig Porter is attached hereto as Exhibit 4.

8

inappropriately with children. Likewise, no one came to President Brimhall from August 14, 2004 until Stark's arrest and complained or suggested in any way that Stark was a danger to children. *Id*. at ¶ 4.

## VI. STARK'S ARREST AND PENDING TRIAL.

In December of 2005 child abuse allegations were made against Stark. Plaintiff's complaint claims that Stark engaged in "sexual misconduct, deviate sexual intercourse with, and other acts of sexual misconduct with ["A"]. Complaint at ¶ 4. Stark's criminal trial is scheduled for January 28, 2008. *Id*. at ¶5. Church Defendants believe that Stark continues to maintain his innocence.

## VII. THE CHURCH'S RESPONSE.

Immediately upon learning of the allegations against Stark, the Church suspended him from his missionary duties. *Id.* at ¶5.

## ARGUMENT

### I. KENTUCKY HAS EXPLICITLY REJECTED A *RESPONDEAT SUPERIOR* CAUSE OF ACTION FOR SEXUAL MISCONDUCT BY A CLERGYMAN.

Plaintiff's Complaint contains only seven paragraphs. The claim against the Church seems to be solely for vicarious liability; no claim for direct negligence is advanced. Indeed, there is no claim that the Church was negligent in any way—that someone in the Church knew of this risk and could or should have done something to prevent the alleged abuse.

The Kentucky Supreme Court has considered and rejected as a matter of law the sole claim which plaintiff advances in this case----that a denomination can be held vicariously liable for sexual misconduct by a local clergyman or religious worker. In *Osborn v. Payne*, 31 S.W.3d 911 (Ky. 2000), the Court was faced with an action filed by a former husband against a priest and his diocese alleging outrageous conduct and vicarious liability for allegedly negligent

9

training, screening, and supervision of a priest who had had an affair with the wife. The plaintiff had argued that the priest was engaging in marriage counseling with the wife -- an activity sanctioned by the church and ordinarily performed by a priest -- and thus *respondeat superior* liability was appropriate. The Court made short work of this argument:

> [Plaintiff] argues that it was because Osborne was a priest that he was called upon by [the couple]; that his help was sought and that he was invited into the home. [Plaintiff] reasons that the diocese should be vicariously liable for the actions of Osborne. We cannot agree. <u>To accept such a theory would in effect require the diocese to become an absolute insurer for the behavior of anyone who was in the priesthood and would result in strict liability on the part of the diocese for any actionable wrong involving a parishioner. We must conclude that such an argument is absurd. Certainly, the scope of employment of a priest could include marriage counseling, but it clearly does not include adultery.</u>

*Id.* at 915 (emphasis added).

The Court went on to explain that in *respondeat superior* cases

> The critical analysis is whether the employee or agent was acting within the scope of his employment at the time of his tortious act. *Wood v. Southeastern Greyhound Lines*, 302 Ky. 110, 194 S.W.2d 81 (1946) provides that for it to be within the scope of its employment, the conduct must be of the same general nature as that authorized or incidental to the conduct authorized. A principal is not liable under the doctrine of respondeat superior unless the intentional wrongs of the agent were calculated to advance the cause of the principal or were appropriate to the normal scope of the operator's employment. In this situation, it is the abuse by the priest of his position that exceeds the scope of his employment. <u>It is beyond question that [the priest] was not advancing any cause of the diocese or engaging in behavior appropriate to the normal scope of his employment</u>. There are a variety of cases from other jurisdictions that comport with our conclusion in this matter.

*Id.* (emphasis added, citations omitted).

The *Osborne* Court allowed a cause of action against the priest for his intentional conduct, but held that "there is nothing to support a claim of vicarious liability for the conduct of

10

the former priest against the diocese, and it cannot be held vicarious liable in this matter." *Id.* at 916.

The Kentucky Supreme Court's decision in *Osborne* mandates that all *respondeat superior* claims against the Church Defendants in this case be dismissed. As in *Osborne*, the "scope of employment of a [missionary] … does not include adultery", or child abuse or molestation. Church President, Gordon B. Hinckley has stated that "The Church's position is that abuse cannot be tolerated in any form." "Personal Worthiness to Exercise the Priesthood", *The Ensign,* May 2002, attached as Exhibit "B" to Brimhall Affidavit. Indeed, President Hinckley and the Church condemn child abuse in the strongest terms:

> And then there is the terrible, vicious practice of sexual abuse. It is beyond understanding. It is an affront to the decency that ought to exist in every man and woman. It is a violation of that which is sacred and divine. It is destructive in the lives of children. It is reprehensible, and worthy of the most severe condemnation. Shame on any man or woman who would sexually abuse a child. In doing so, the abuser not only does the most serious kind of injury. He or she also stands condemned before the Lord.

President Gordon B. Hinckley, "Save the Children", *The Ensign*, October 1994, p. 34, attached as Exhibit "C" to Brimhall Affidavit.

President Hinckley has specifically warned missionaries to avoid even the appearance of impropriety with children:

> As missionaries, you are expected to maintain the highest standards of conduct, including strict observance of the law of chastity…. You should never be alone with anyone else, male or female, adult or child [other than your assigned companion]. Even false accusations against an innocent missionary can take many months to investigate and may result in disruption or termination of missionary service. Protect yourselves from such accusations by never being separated from your companion, even in the homes you visit.

11

Gordon B. Hinckley, "Personal Worthiness to Exercise the Priesthood", *The Ensign,* May 2002, attached as Exhibit "B" to Brimhall Affidavit. The Church's Missionary Handbook likewise requires missionaries to "maintain the highest standards of conduct, including strict observance of the law of chastity, which forbids any sexual conduct of any kind whatsoever." Missionary Handbook, p. 13, attached as Exhibit "A" to Brimhall Affidavit. It also mandates that missionaries "never be alone with anyone [except a missionary companion], male, or female, adult or child" and that missionaries should "never be[] separated from your companion, even in the homes you visit, and … avoid[] any touching that could possibly lead to accusations, such as holding a child on your lap, hugging, tickling, or being too familiar with a child or adolescent." *Id.* at pp. 13-14.

Clearly, if Jason Stark abused "A" as alleged in the complaint, "[i]t is beyond question that he] was not advancing any cause of the [Church] or engaging in behavior appropriate to the normal scope of his employment." *Osborne,* 31 S.W.3d at 915. Plaintiff's complaint admits as much, acknowledging in Paragraph 4 that the abuse was "against the morals of the very church which he was representing." Thus, Church Defendants' motion for summary judgment on the vicarious liability claims should be granted.

II.   **THE CHURCH DEFENDANTS CANNOT BE HELD LIABLE FOR STARK'S ALLEGED INTENTIONAL TORTS UNDER THEORIES OF NEGLIGENT SELECTION, TRAINING, OR SUPERVISION.**

Plaintiff's Complaint does not seem to attempt to state a claim against the Church for any direct negligence in selecting, training, or supervising Stark. Indeed, Plaintiff could plead no cause of action for these torts which would survive a motion for summary judgment. As the affidavits submitted with this motion make clear, the Church had no knowledge of any kind that Stark would engage in abuse of children, in spite of thorough screening, training, and oversight.

12

Thus, Church Defendants' motion for summary judgment should also be granted as to any direct claim.

The *Osborne* court considered allegations that the Catholic Diocese had negligently trained, screened, and supervised the priest who had sexual relations with the wife of the plaintiff. After considering the evidence before it, the Kentucky Supreme Court held:

> [Plaintiff] has failed to present any evidence in the record that [the priest] had a history of sexual misconduct involving parishioners or that the diocese had any knowledge that [the priest] might conceivably engage in such misconduct. Consequently, we must conclude that the summary judgment granted by the circuit court and affirmed by the Court of Appeals as to the diocese was correct. There was no basis to support a claim of independent negligence by the diocese so as to support a rejection of the motion for summary judgment."

*Osborne v. Payne*, *supra*, at 915-16.

The same decision is mandated in this case. As the affidavits of Stark's clergymen at the time he was screened for his mission make clear, Stark was asked many questions about his worthiness to serve a mission, including specific questions about his sexual history. None of his answers indicated that he had any tendency to act inappropriately with children. Donahoo Affidavit at ¶ 4; Powell Affidavit at ¶ 4. Nothing in Stark's manner or activities lead these leaders to believe that Stark would be a danger to children. Donahoo Affidavit at ¶ 4, Powell Affidavit at ¶ 4. No one in the community or the congregation had made complaints to these leaders about any inappropriate actions by Stark. Porter Affidavit at ¶ 4, Donahoo Affidavit at ¶ 4; Powell Affidavit at ¶ 4. Stark was well known to the people who approved his missionary application; both bishops who met with him during his application process had known him for fourteen years at the time he applied for missionary service---since he was five years old and moved into the boundaries of their congregation. Donahoo Affidavit at ¶ 3; Porter Affidavit at

13

¶ 3.

Stark was thoroughly trained as a missionary to avoid being alone with children, and certainly to avoid abusing them. In the Missionary Training Center missionaries are instructed to obey the law of chastity, to avoid sexual conduct of any kind outside of marriage, to always stay in sight of their missionary companions, and even to avoid any behavior which could be misunderstood or appear inappropriate. Brimhall Affidavit at ¶ 15.

Once in the mission field, Stark was competently supervised. His mission president, Dennis Brimhall, stressed the importance of abiding by all of the mission rules, including staying with his companion and never acting inappropriately with children. Brimhall Affidavit at ¶ 16. President Brimhall interviewed all of his missionaries at least every six weeks, including questions about obeying the law of chastity. Brimhall Affidavit at ¶ 17. From August 1, 2004 when Stark arrived in the mission field until December of 2005 when abuse allegations were made, Stark gave President Brimhall no reason to believe that he had any tendency to act inappropriately with children. Brimhall Affidavit at ¶ 4. Likewise, no one came to President Brimhall during that period and complained or suggested in any way that Stark might pose a danger to children. Brimhall Affidavit at ¶ 5.

In short, none of Stark's ecclesiastical leaders had any indication until the abuse allegations were made in Decmeber of 2005 that Stark might in any way pose a danger to children. Donahoo Affidavit at ¶ 5; Porter Affidavit at ¶ 5; Powell Affidavit at ¶ 5; Brimhall Affidavit at ¶ 4. And, at that point, Stark was immediately relieved of his duties. Brimhall Affidavit at ¶ 5.

Since no facts can be presented which would serve to establish any basis of independent negligence on the part of the Church Defendants, their motion for summary judgment should be granted.

## CONCLUSION

For all the reasons stated herein, Plaintiff cannot sustain any claim against Church Defendants as a matter of law. Accordingly the Court should grant summary judgment in favor of Church Defendants and dismiss all claims in Plaintiff's complaint as against Church Defendants.

                        Respectfully submitted,

                        /s/ Jon L. Fleischaker_____
                        Jon L. Fleischaker
                        Jeremy S. Rogers
                        DINSMORE & SHOHL LLP
                        1400 PNC Plaza
                        500 West Jefferson Street
                        Louisville, KY 40202
                        (502) 540-2344 (Telephone)
                        (502) 585-2207 (Fax)
                        *Counsel for Church Defendants*

## CERTIFICATE OF SERVICE

      I hereby certify that a true copy of the foregoing was this 6th day of September, 2007 filed electronically via the Court's CM/ECF system, which effects service via email upon the following:

Michael Stidham
Bruce Francisky
P.O. Box 732
Jackson, Kentucky 41339
*Counsel for Plaintiff*

Bernard Pafunda
Pafunda Law Office
175 E. Main Street
Suite 600
Lexington, KY  40507
*Counsel for Defendant Jason Stark*

                                        /s/ Jon L. Fleischaker
                                        Counsel for Church Defendants