```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF KENTUCKY
```
**CENTRAL DIVISION at LEXINGTON**

```
BARBARA OLINGER, as Mother and  )
Next Friend of "A," a Minor     )
Child Under the Age of          )   Civil Action No. 5:07-29-JMH
18 Years,                       )
                                )
     Plaintiff,                 )
                                )
v.                              )   MEMORANDUM OPINION AND ORDER
                                )
CORPORATION OF THE PRESIDENT    )
OF THE CHURCH OF JESUS CHRIST   )
OF LATTER-DAY SAINTS  and       )
JASON STARKS,                   )
                                )
     Defendants.                )
```

                     **      **      **      **      **

This matter is before the Court on the Motion of Defendant Corporation of the President of The Church of Jesus Christ of Latter-Day Saints ("COP") for Summary Judgment [Record No. 23.] Plaintiff has filed a response in opposition thereto [Record No. 26], and the COP has filed a reply in further support of its motion [Record No. 27]. This motion is now ripe for decision, and, for the reasons set forth below, Defendant COP's motion for summary judgment shall be granted.

**I.   BACKGROUND**

   **A.   The Present Case**

Plaintiff Barbara Olinger, as mother and next friend of her minor son, "A," filed suit against the Church of Jesus Christ of

Latter-Day Saints (hereinafter, "Church")[1] and Defendant Jason Starks[2] on December 18, 2006, in the Lee County Circuit Court [Record No. 1], alleging that Starks "engaged in sexual misconduct, deviate sexual intercourse with, and other acts of sexual misconduct with the plaintiff's minor child, 'A,'" while "acting as an agent, servant, employee, or otherwise on behalf of the defendant, the Church of Jesus Christ of Latter-Day Saints." [Compl. at ¶¶ 3-4.]  Defendant COP removed the matter to this Court on January 26, 2007, on grounds of complete diversity of the parties [Record No. 1].  Although the Complaint does not clearly recite specific causes of action against Defendant COP, the Court has reviewed Plaintiff's response to Defendant COP's motion to dismiss all claims against it [Record No. 26] and understands that Plaintiff seeks (1) to hold the Church vicariously liable for Starks' alleged abuse of "A"  and (2) to hold the church directly

---

[1] In the course of this litigation, it has been made clear that the Church of Jesus Christ of Latter-Day Saints does not exist as a legal, corporate entity.  All parties concede that Corporation of the President of the Church of Jesus Christ of Latter-Day Saints ("COP") is, in fact, the proper party defendant.  For ease of discussion, the Court will follow the practice of the parties to this matter and refer to Defendant COP interchangeably as "the COP," "the Church of Jesus Christ of Latter-Day Saints," or "the Church."

[2] The COP has stated that its co-defendant in this matter is properly named "Jason Stark" not "Jason Starks."  [Record No. 23, COP Memo. of Law at 1.]  The Court remarks that counsel for Defendant Starks has filed an Answer on behalf of "Jason Starks." [Record No. 4.]  Accordingly, the Court shall refer to co-defendant as "Jason Starks."

2

liable for any injuries to "A" on a theory of negligent hiring, supervision, or retention.

### B. Missionary Work and the Church of Jesus Christ of Latter-Day Saints

Missionary work is extremely important to the Church. [Affidavit of Dennis C. Brimhall (hereinafter, "Brimhall Aff.") at ¶6.] Church members wishing to become a missionary apply to do so. [Brimhall Aff. at ¶10.] An interested person is first interviewed by his or her local clergyman, called a bishop, regarding his or her worthiness to serve, qualifications, and physical and emotional capability to serve. [*Id.*] If the candidate seems worthy, the bishop provides the candidate a missionary recommendation packet, which includes forms to be completed by the missionary, a Church officer, and medical professionals. [*Id.*] The packet includes questions on health, family background, educational and work experience, and similar subjects, as well as a request for information about criminal history. [*Id.* at ¶11.] The bishop will then conduct a second, more detailed interview with the candidate. [*Id.*] In both the first and second interview, questions about the candidate's sexual history are posed. [*Id.*] Those candidates who indicate any problem with the law of chastity, including any attraction to or improper conduct with children, are not allowed to complete the application process. [*Id.*]

If the bishop is satisfied that a candidate is worthy to become a missionary, he forwards the candidate's application packet

to his ecclesiastical superior, the stake president. [*Id.* at ¶12.] The stake president interviews the candidate and again asks questions concerning the candidate's worthiness to serve as a missionary, including questions about sexual history and activity. [*Id.*] A candidate indicating a problem with the law of chastity, including improper attraction to or actions with children, is not allowed to serve as a missionary. [*Id.*] If the stake president is satisfied that a candidate is worthy to become a missionary, he submits the application forms to the Church's Missionary Department. [*Id.*] The Missionary Department again screens the applications and, if satisfied that a candidate is worthy to become a missionary, the Department passes the application along to senior ecclesiastical officers who determine where each candidate should serve and send a letter informing the candidate of his or her selection and the place of his or her missionary service. [*Id.* at ¶¶13 and 14.]

Those serving as missionaries are trained at the Missionary Training Center for a period ranging from three weeks to two months or more. [*Id.* at ¶14.] Missionaries are instructed to obey the law of chastity, to avoid sexual conduct of any kind outside of marriage, to always stay in sight of their missionary companion, and to avoid any behavior that could be misunderstood or appear inappropriate. [*Id.* at ¶15.]

While at the Missionary Training Center, missionaries are

4

given a copy of the Missionary Handbook, which they are to keep with them at all times during their missionary service. [*Id*.] The Missionary Handbook instructs, in part, that:

> As missionaries, you are expected to maintain the highest standards of conduct, including strict observance of the law of chastity, which forbids any sexual conduct of any kind whatsoever. In addition, you need to be aware that any touching of the private parts of another person, whether under or over clothing can constitute criminal conduct. If the victim is a child or youth, the penalties are especially severe, including imprisonment.[3]
>
> To assist you to obey the law of chastity and to avoid criminal charges, you should always remain with your companion. You should never be alone with anyone else, male or female, adult or child.
>
> Even false accusations against an innocent missionary can take many months to investigate and may result in disruption or termination of missionary service. Protect yourselves from such accusations by never being separated from your companion, even in the homes you visit, and by avoiding any touching that could possibly lead to accusations, such as holding a child on your lap, hugging, tickling, or being too familiar with a child or adolescent.

[*Id*. (Missionary Handbook at pp. 13-14).]

After completing courses at the Missionary Training Center, the missionaries are sent to their missions, where they are met by

---

[3] The COP has presented evidence, as well, that the abuse of children, including sexual abuse, is in contravention of the doctrine of the Church of Jesus Christ of Latter-Day Saints and has been strongly condemned by Gordon B. Hinckley, the Prophet and President of the Church. [Brimhall Aff. at ¶18-19.]

their Mission Presidents. [*Id.* at ¶16.] Missionaries are interviewed every six weeks by their Mission Presidents and asked questions about whether they continue to be worthy to serve as missionaries, including questions about whether they are observing the law of chastity. [*Id.* at ¶17.]

### C. Defendant Starks' Application to Serve and Service as a Missionary

Defendant Jason Starks was a member of the Hibbard 1st Ward of the Church of Jesus Christ of Latter-Day Saints (a local congregation of the Church) in March of 2004. His ward was, in turn, part of a group of thirteen wards called a "stake" known as the Rexburg Idaho North Stake. [Affidavit of Wes Donahoo (hereinafter, "Donahoo Aff.") at ¶ 2; Affidavit of Wylie Gene Powell (hereinafter, "Powell Aff.") at ¶¶2-3.] At that time, Defendant Starks approached the local clergyman of his ward, Bishop Wes Donahoo, and stated that he wished to apply to serve as a missionary. [Donahoo Aff. at ¶ 4.] Bishop Donahoo, who had known Starks for fourteen years, had never heard anything about Starks that would lead him to believe that Starks would pose a danger to children nor had he observed anything in Starks' manner or activities which led him to believe that Starks would abuse or harm children. [*Id.*] Donahoo interviewed Starks and asked him many questions about his worthiness to serve as a missionary, including specific questions about his sexual history. [*Id.*] None of his answers indicated that Starks had any tendency to act

inappropriately with children.  [*Id.*]

Starks was next interviewed by Wylie Gene Powell, President of the Rexburg Idaho North Stake. [Powell Aff. at ¶¶2-4.] President Powell had heard nothing of Starks which led him to believe that Starks would pose a danger to children and had observed nothing in his manner or activities which led him to believe that Starks would abuse or harm children. [*Id.*] Powell asked Starks many questions about his worthiness to serve as a missionary, including specific questions about his sexual history. [*Id.*] None of his answers indicated that Starks had any tendency to act inappropriately with children. [*Id.*]

On March 28, 2004, Bishop Donahoo was replaced as Bishop of the Hibbard 1st Ward by Bishop Craig Porter. [Donahoo Aff. at ¶2; Affidavit of Craig Laurin Porter (hereinafter, "Porter Aff.") at ¶2.] At that time, Bishop Porter had known Starks for approximately fourteen years and had no knowledge that would lead him to believe that Starks might be a danger to children. [*Id.* at ¶2, 4.] Bishop Porter served as Starks' local clergyman from March 28, 2004, until Starks left for the Missionary Training Center on July 21, 2004. [*Id.* at 3.] During their conversations in that period, Starks said nothing to lead Porter to believe that he might later commit the crime of which he has been accused. [*Id.* at 4.] No one in Bishop Porter's congregation or in the community came to Porter to tell him that they had any knowledge or suspicion that

7

Starks might harm or abuse children. [*Id.*]

Starks arrived in the Kentucky Louisville Mission on August 10, 2004, where he was met and interviewed by Dennis C. Brimhall, President of that Mission. [Brimhall Aff. at ¶3.] At that time, Brimhall had heard nothing of Starks which led him to believe that Starks would pose a danger to children. [*Id.* at 4.] Brimhall interviewed Starks on several occasions from August 14, 2004, until December 2005. [*Id.*] During those interviews, Starks said nothing that gave Brimhall reason to believe that Starks had any tendency to act inappropriately with children. [*Id.*] No one came to President Brimhall from August 14, 2004, until Starks' arrest and complained or suggested in any way that Starks was a danger to children. [*Id.*]

Plaintiff has stated by affidavit that, during Starks' tenure as a missionary, Starks worked together with a missionary companion, Elder Rexroat. [Aff. of Barbara Olinger (hereinafter, "Olinger Aff.") at ¶4.] During their missionary service, Elder Rexroat and Starks did not remain together at all times while in the company of her child, "A." [*Id.* at ¶4.] The Court understands this to mean that one or the other of these missionary companions, and presumably Starks, was alone with "A" at the time of the alleged wrongful acts.

In December 2005, abuse allegations were made against Starks by "A," and, upon learning of the allegations, the Church

8

immediately suspended Starks from his missionary duties. [Brimhall Aff. at ¶5.] Starks' criminal trial is scheduled to begin on January 28, 2008. [*Id.* at ¶5.]

## II. STANDARD OF REVIEW

A grant of summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

The moving party bears the initial burden to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). This burden is met simply by showing the court that there is an absence of evidence on a material fact on which the nonmoving party has the ultimate burden of proof at trial. *Id.* at 325. The burden then shifts to the nonmoving party to "come forward with some probative evidence to support its claim." *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). A material fact is one that may affect the outcome of the issue at trial, as determined by substantive law. *Celotex*, 477 U.S. at 325.

When determining if summary judgment is proper, the Court's function is not to weigh the evidence, but to decide whether there are genuine factual issues for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Multimedia 2000, Inc. v. Attard*,

9

374 F.3d 377, 380 (6th Cir. 2004). A genuine dispute exists on a material fact, and thus summary judgment is improper, if the evidence shows "that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248; *Summers v. Leis*, 368 F.3d 881, 885 (6th Cir. 2004). The evidence should be construed in the light most favorable to the nonmoving party when deciding whether there is enough evidence to overcome summary judgment. *Anderson*, 477 U.S. at 255; *Summers*, 368 F.3d at 885. While this Court must draw all inferences in a light most favorable to the plaintiff, summary judgment may be granted "if the record, taken as a whole, could not lead a rational trier of fact to find for [the plaintiff]." *McKinnie v. Roadway Express*, Inc., 341 F.3d 554, 557 (6th Cir. 2003) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

**III. ANALYSIS**

    **A. DEFENDANT COP CANNOT BE HELD VICARIOUSLY LIABLE UNDER THE DOCTRINE OF RESPONDEAT SUPERIOR FOR STARKS' ALLEGED ACTIONS**

Defendant COP argues that Starks was not acting within the scope of his missionary work, undertaken on behalf of the COP, when he allegedly molested "A" and that it cannot be liable for Starks' intentional wrongs under the doctrine of respondeat superior. Plaintiff, however, takes the position that a reasonable jury could find that Starks' alleged actions were calculated to advance the cause of the COP and that summary judgment is inappropriate. For

10

the reasons set forth below, the Court is of the opinion that, based on the undisputed facts, no reasonable jury could find that Starks was acting within the scope of his missionary work or that he was acting to advance any cause of the COP when he allegedly molested "A." Accordingly, summary judgment shall be granted, and Plaintiff's claims of vicarious liability against the COP shall be dismissed.

Under Kentucky law, "[a] principal is not liable under the doctrine of respondeat superior unless the intentional wrongs of the agent were calculated to advance the cause of the principal or were appropriate to the normal scope of the operator's employment." *Osborne v. Payne*, 31 S.W.3d 911, 915 (Ky. 2000) (citing *Hennis v. B.F. Goodrich Co., Inc.*, 349 S.W.2d 680 (Ky. 1961)). As further explained in *Patterson v. Blair*, "[t]he critical analysis is whether the employee or agent was acting within the scope of his employment at the time of his tortious act." *Patterson v. Blair*, 172 S.W.3d 361, 368 (Ky. 2005).

To be within the scope of employment, an employee's action must be of the same general nature as that authorized or incidental to the conduct authorized, i.e., the actions must be taken to advance the employer's desired ends. *Id.* (*citing Wood v. Southeastern Greyhound Lines,* 194 S.W.2d 81 (Ky. 1946)). Under the Kentucky approach, if an employee "acts from purely personal motives ... which [are] in no way connected with the employer's

11

interests, he is considered in the ordinary case to have departed from his employment, and the master is not liable." W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* 506 (5th ed. 1984) (quoted in *Patterson*, 172 S.W.3d at 369).

So it was in *Osborne* that the Kentucky Supreme Court held, as a matter of law, that a denomination could not be held vicariously liable by a cuckolded husband for the sexual misconduct of a local priest who had an affair with plaintiff's wife while serving as a marriage counselor for the couple. *Osborne*, 31 S.W.3d at 915. Because the affair was neither authorized by the church nor incidental to the counseling authorized by the church, it was outside of the scope of employment of the priest. *Id*. The Kentucky Supreme Court commented that to decide otherwise, on the facts, "would in effect require the diocese to become an absolute insurer for the behavior of anyone who was in the priesthood and would result in strict liability on the part of the diocese for any actionable wrong involving a parishioner." *Id.* The court concluded "that such an argument is absurd." *Id.*

*Osborne* must, of course, be understood in context with the earlier decision in *Patterson*, in which the Kentucky Supreme Court held that a jury could properly find an employer vicariously liable for damages where an employee of an automobile dealership shot out the tires of a vehicle during an attempt to repossess the vehicle. *Patterson*, 172 S.W.3d at 372. In that instance, the employee's

12

conduct of which the plaintiff complained, shooting out the tires of a vehicle to be repossessed, was at least incidental to the conduct authorized by the dealership – repossessing the vehicle – and was not so outrageous, even though criminal, as to indicate that the employee's motive was personal. *Id.* It could, thus, be ascribed to the employer. *Id.*

While Plaintiff theorizes that Defendant Starks *may* have been motivated to molest "A" in a misguided effort to recruit "A" as a new member of the Church and was, thus, carrying out the "business" of COP, she has offered no evidence to support her theory. Fed. R. Civ. P. 56 requires a party opposing a motion for summary judgment to provide "by affidavits or as otherwise provided in [Fed. R. Civ. P. 56] . . . specific facts showing that there is a genuine issue for trial."[4] Fed. R. Civ. P. 56(e). Without support, her theory

---

[4] In her Response Brief, Plaintiff suggests that further discovery is necessary to ascertain whether, in fact, Starks intended to use molestation as a means of recruiting her son to the Church and whether the Church did all it could to screen and supervise Starks. While a summary judgment motion, "as a matter of discretion, may be found premature where discovery has not commenced," Plaintiff has failed to present an affidavit explaining the reasons, in good faith, that she cannot present "facts essential to justify the [her] opposition" of Defendant COP's motion for summary judgment at this time. Fed. R. Civ. P. 56(f); *Brock v. Marymount Medical Center, Inc.*, Civil Action No. 6:06-285-DCR, 2007 WL 196895, *8 (E.D.Ky. Jan. 23, 2007) (*citing McKinley v. City of Mansfield,* 404 F.3d 418, 443 (6th Cir. 2005); *Vance By and Through Hammons v. United States,* 90 F.3d 1145, 1149 (6th Cir. 1996)). Accordingly, the Court is not persuaded that it should "refuse the application for judgment or . . . order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had," and Plaintiff's motion for the same [Record No. 26] shall be denied. Fed. R. Civ. P. 56(f).

is nothing more than rank speculation. Indeed, the undisputed evidence in this matter leads inexorably to the conclusion that, if the allegations against Starks are true, he was acting in his own interest and to satisfy his own sexual proclivities at the time of the alleged molestation. There is no evidence that Starks or anyone else believed that he was acting to further the interest of the COP at the time of the alleged wrongdoing. Further, Plaintiff has presented no evidence to suggest that the COP encouraged its missionaries to engage in untoward sexual behavior with anyone, particularly children, in order to recruit new members to the Church. She has made no effort to refute the evidence presented by the COP of its condemnation of child sexual abuse and its efforts to discourage and dissuade its missionaries from engaging in sexual activity of any kind or even the appearance of sexual impropriety during their tenure as missionaries.

As with the priest in *Osborne,* the evidence of record demonstrates that the actions allegedly taken by Starks would constitute abuse of his position, far exceed the scope of his employment, and take his behavior out of the realm normally undertaken by a missionary and which might be reasonably considered to advance the interests of the COP. With regard to the alleged sexual abuse of "A," there is no evidence that such abuse was part of the normal scope a missionary's work or that Starks even intended to use sexual acts to advance any cause of the COP. There

being no disputed issue of material fact, summary judgment on Plaintiff's claims of vicarious liability against the COP is appropriate and shall be granted.

**B.    Negligent Hiring, Supervision, and Retention**

In Kentucky, "an employer can be held liable when its failure to exercise ordinary care in hiring or retaining an employee creates a *foreseeable* risk of harm to a third person." *Oakley v. Flor-Shin, Inc.*, 964 S.W.2d 438, 442 (Ky. App. 1998) (emphasis added). "The most important factor in determining whether a duty exists is foreseeability." *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 89 (Ky. 2003).  As further explained in *Hammons*:

> Foreseeable risks are determined in part on what the defendant knew at the time of the alleged negligence. "The actor is required to recognize that his conduct involves a risk of causing an invasion of another's interest if a reasonable man would do so while exercising such attention, perception of the circumstances, memory, knowledge of other pertinent matters, intelligence, and judgment as a reasonable man would have." Restatement (Second) of Torts § 289(a); *see also Mitchell v. Hadl,* 816 S.W.2d 183, 186 (Ky. 1991). (Holding that liability for negligence is based on what the defendant was aware of at the time of the alleged negligent act and not on what the defendant should have known in hindsight).

*Hammons*, 113 S.W.3d at 90 (internal emphasis omitted). Accordingly, this Court must determine whether there is a genuine issue of material fact as to whether the harm allegedly caused to "A" was foreseeable to the COP, i.e., whether the COP knew, or

reasonably should have known, that (1) Starks was unfit to serve as a missionary, and (2) whether his placement or retention as a missionary created an unreasonable risk of harm to "A." *Oakley*, 964 S.W.2d at 442.

The evidence of record of this matter demonstrates that the COP required candidates for its missionary program to complete an involved application process and undergo multiple levels of screening by various church officers. The evidence further reveals that missionaries, once selected, continued to meet regularly for interviews with church officers during their tenure in the missionary program. Finally, the unrefuted evidence shows that Defendant COP did not receive information at any time during the application or training process or prior to Starks' alleged encounter with "A" that would lead them to believe that Starks had ever or would ever commit a sexual act with a child. Plaintiff has marshaled no evidence to suggest that the COP knew or should reasonably have known that Starks was somehow unfit to serve as a missionary or that his placement or retention of a missionary created an unreasonable risk of harm to "A" or that any such information came to light prior to the COP learning of the events alleged against Starks with regard to "A," at which time the COP terminated Starks' service as a missionary

This facts of this matter are quite distinct from those presented to the Kentucky Court of Appeals in *Oakley*, upon which

16

Plaintiff relies. The *Oakley* court held that it was for a jury to determine whether an employer could have foreseen a sexual assault committed by its unsupervised employee on a worksite. *Oakley*, 964 S.W.2d at 441. Specifically, there was an issue of material fact in *Oakley* as to whether the employer knew or should have known that its employee had an extensive criminal record, including an arrest for criminal attempt to commit rape in the first degree and for carrying a concealed deadly weapon, and that its employee would be performing services for a client inside of a locked store with a single client employee. *Id.* The employer's knowledge of its employee's criminal propensities, coupled with the employer's knowledge that the employee would literally be locked inside an otherwise unsupervised worksite with one other person, who ultimately became his victim, created an issue of fact for the jury. *Id.*

Further, the Court is unpersuaded by Plaintiff's argument that a reasonable jury could find the COP to be negligent in hiring, retaining, and supervising Starks as a missionary based solely on certain provisions in the Missionary Handbook and Starks' alleged failure to follow these guidelines. Plaintiff relies on that portion of the Handbook which instructs that:

> As missionaries, you are expected to maintain the highest standards of conduct, including strict observance of the law of chastity, which forbids any sexual conduct of any kind whatsoever. In addition, you need to be aware that any touching of the private parts of

17

> another person, whether under or over clothing can constitute criminal conduct. If the victim is a child or youth, the penalties are especially severe, including imprisonment.
>
> To assist you to obey the law of chastity and to avoid criminal charges, you should always remain with your companion. You should never be alone with anyone else, male or female, adult or child.
>
> Even false accusations against an innocent missionary can take many months to investigate and may result in disruption or termination of missionary service. Protect yourselves from such accusations by never being separated from your companion, even in the homes you visit, and by avoiding any touching that could possibly lead to accusations, such as holding a child on your lap, hugging, tickling, or being too familiar with a child or adolescent.

[Brimhall Aff. at ¶ 15, Handbook at pp. 13-14.]

The presence of this language in the Guidebook does not support a finding that the COP was negligent in hiring, retaining, and supervising Starks. Even if Starks and his missionary companion did not follow the instruction to never be separated and even if Starks committed an act of sexual abuse while serving as a missionary, in violation of the Handbook's prohibition of the same, it is not enough to establish negligence on the part of the COP without anything more. Plaintiff has failed to provide any evidence that anyone associated with the Church, including Elder Rexroat, had reason to believe that Starks was unfit to serve as a missionary or posed a danger to "A" or anyone else. It is

ludicrous to suggest that, because the COP chose to caution its missionaries against sex outside of marriage and to avoid criminal misconduct or the appearance of impropriety, the COP had knowledge that Starks might conceivably engage in sexual abuse of "A" and should be liable for such actions.

In this instance, there is no evidence upon which a reasonable jury could conclude that it was foreseeable to the COP that Starks would molest anyone during his tenure as a missionary. Accordingly, Plaintiff's claims that the COP was negligent in hiring, retaining, and supervising Starks shall be dismissed.

## IV. CONCLUSION

Accordingly, **IT IS ORDERED**:

(1) that Plaintiff's motion for a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had [Record No. 26] shall be and the same hereby is **DENIED**;

(2) that Defendant COP's motion for summary judgment [Record No. 23] shall be, and the same hereby is **GRANTED**, and

(3) that all claims against Defendant COP shall be, and the same hereby are, **DISMISSED**.

This the 31st day of October, 2007.



**Signed By:**

*Joseph M. Hood*

**Senior U.S. District Judge**